IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAVONCE BROWN,<br><br>Plaintiff,<br><br>v.<br><br>BIOMAT USA, INC.,<br><br>Defendant. | Case No. 20-cv-05437<br><br>Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lavonce Brown ("Brown") alleges that his former employer Biomat USA, Inc. ("Biomat") violated the Illinois Whistleblower Act ("IWA"), 740 ILCS § 174/1, *et seq.* (Count I), and retaliated against him by terminating his employment after he reported Biomat's noncompliance with COVID-19 regulations to the FDA (Count II).[1] (Dkt. 16). For the reasons stated herein, Biomat's motion to dismiss (Dkt. 17) is denied.

**I. Background**

The following factual allegations are taken from the Amended Complaint, (Dkt. 16) and are accepted as true for the purposes of this motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). Brown was hired by Biomat, a plasma donation center, in 2015 and promoted from Donor Processor to

---

[1] Jurisdiction is proper because the amount of controversy exceeds $75,000 and the parties are completely diverse. 28 U.S.C. §1332. Brown is a citizen of Illinois and Biomat is a citizen of Delaware, where it is incorporated, and of California, where its principal place of business is located. (Dkt. 1 at 3).

1

Lead Donor Center Technician and eventually to Operational Supervisor. (Dkt. 16 at ¶¶ 5–7). From 2015 until March of 2020 Brown received excellent performance reviews. (*Id.* at ¶ 9).

In January of 2020, the United States Secretary of Health and Human Services declared COVID-19 a public health emergency. (*Id.* at ¶ 12). On March 9, 2020, Governor Pritzker issued a Disaster Proclamation, saying that the pandemic qualified as a disaster under Section 7 of the Illinois Emergency Management Agency Act ("EMAA"), 20 ILCS 3305/7.[2] (*Id.* at ¶ 13; Ex. A). On March 20, 2020, Governor Pritzker issued Executive Order 2020-10 pursuant to the EMAA,[3] mandating social distancing and other measures. (*Id.* at ¶ 15).

On March 30, 2020, Brown contacted the FDA and reported that Biomat was not following the Executive Order's social distancing and capacity-reduction protocols. (*Id.* at ¶¶ 16–20). In early April of 2020, Brown notified Biomat that he had reported these violations to the FDA. He reported that BIOMAT was "allowing too many people in the building without social distancing and that it did not reduce the total number of seats in the lobby." *Id.* He further reported that Biomat did not limit the

---

[2] Section 7 says that "[i]n the event of a disaster, as defined in Section 4, the Governor may by proclamation declare that a disaster exists. Upon such proclamation, the Governor shall have and may exercise for a period not to exceed 30 days the following emergency powers: [. . .] "[t]o control ingress and egress to and from a disaster area, the movement of persons within the area, and the occupancy of premises therein." 20 Ill. Comp. Stat. Ann. 3305/7(8).

[3] Executive Order 2020-10 says that "[f]or purposes of this Executive Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals," and that "Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements." (Dkt. 16, Ex. B).

number of donors in the building or manage the appointment system to comply with social distancing requirements. *Id.*

Brown alleges that "various individuals" at Biomat became hostile towards him. (*Id.* at ¶ 21). On April 23, 2020, Brown was suspended by Biomat for blocking off appointments in its online appointment system, though Brown both denies that he blocked off any appointments and asserts that he was not responsible for scheduling appointments. (*Id.* at ¶¶ 22–24). On April 30, 2020, Brown's employment was terminated by Center Manager Sandra Smiley, who was aware of his FDA report. (*Id.* at ¶¶ 24–25). Brown alleges he was suspended and later terminated because he reported Biomat's COVID-19 safety violations to the FDA. (*Id.* at ¶ 27).

**II. Standard**

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *See Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts the plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in their favor. *See Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual

3

allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (quotations and citation omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)).

**III. Analysis**

**A. Illinois Whistleblower Act**

Section 15(b) of the Illinois Whistleblower Act ("IWA") states that "an employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b). The Defendant's only contention is that Executive Order 2020-10 does not qualify as a "state or federal law, rule, or regulation." (Dkt. 18 at 3–5, citing 740 ILCS 174/15).

Biomat first addresses the case law, pointing out that its "research turned up no cases in which a court allowed a plaintiff to assert an IWA claim after 'blowing the whistle' on an alleged violation of an *executive order*." (Dkt. 18 at 4) (emphasis added).

4

But Biomat does not appear to have found any cases in which a court *denied* such an IWA claim either, as the only opinions it cites are inapposite. *See Milsap v. City of Chicago*, No. 16 CV 4202, 2019 WL 4749971, at *5 (N.D. Ill. Sept. 30, 2019) (plaintiff denied summary judgment on IWA claim premised on reporting the violation of a *city* ordinance, because it was neither a *state* nor a *federal* law); *Sweeney v. City of Decatur*, 79 N.E.3d 184, 189–90 (Ill. App. 2017) (IWA claim failed because plaintiff only notified the lawbreaker and not another authority that he was violating state law, the opinion contains no discussion of the meaning of "law, rule, or regulation"); *Larsen v. Provena Hospital*, 27 N.E.3d 1033 (Ill. App. 2015) (considering whether Hospital Act preempted the IWA and how IWA defines "employee," not the meaning of "law, rule, or regulation"); *Sardiga v. Northern Trust Company*, 948 N.E.2d 652, 656–658 (Ill. App. 2011) (applying 174/20 not 174/15, no discussion of the meaning of "law, rule, or regulation").

Biomat next argues, without citing any case law, that because Executive Order 2020-10 did not go through the full legislative process, it does not qualify as a law, rule, or regulation. (Dkt. 18 at 4–5). The Court is not persuaded. As Brown points out, the Governor issued this Executive Order pursuant to the Illinois Emergency Management Agency Act. (Dkt. 20 at 3, citing Executive Order 2020-10, § 17; 20 ILCS 3305/7). The Act, which did undergo the full legislative process, empowers the Governor to draft and enforce necessary emergency orders during a disaster.

The IWA's definition section does not define the terms "law", "rule", or "regulation." 740 ILCS 174/5. Unless terms are otherwise defined, the Court

5

interprets them "as taking their ordinary, contemporary, common meaning". *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020). Executive Orders are "rules" in the ordinary sense of the word; they are edicts that citizens must obey. Furthermore, giving these terms a narrow or formalistic definition would not be in keeping with the rest of the IWA, which requires only that employees have "*reasonable cause to believe* that the information discloses a violation of a State or federal law, rule, or regulation." (Dkt. 20 at 5, citing 740 ILCS 174/15(b)) (emphasis added). Brown believed his employer was violating the state's *rules* when it violated Governor Pritzker's Executive Order. This Court cannot say that belief was unreasonable.[4] As such, the Court holds that Executive Orders are "rules" within the meaning of the statute.

**B. Retaliatory Discharge**

To state a claim of retaliatory discharge, an Illinois tort, a plaintiff must establish that "(1) the employer discharged the employee, (2) the discharge was in retaliation for the employee's activities, and (3) the discharge violates a clearly mandated public policy." *See Roberts v. Board of Trustees of Community College District No. 508*, 135 N.E.3d 891, 896 (Ill. 2019). Biomat concedes that Brown has alleged facts sufficient to satisfy the first two elements. (Dkt. 18 at 5). The only question is whether his discharge violated a clear mandate of public policy.

---

[4] Brown also argues that the IWA included commentary about Governor Pritzker's COVID-19-related Executive Orders. (Dkt. 20 at 5–6). The commentary Brown cites was written by Westlaw's Editorial team not by the legislature and the Court will not rely on it as a statutory interpretation tool. However, this commentary and Brown both observe that a later Executive Order provides: "[p]ursuant to Section 25(b) of the Whistleblower Act, 740 ILCS 174, businesses are prohibited from retaliating against employee for disclosing information where the employee has reasonable cause to believe that the information discloses a violation of this Order." Executive Order 2020-32, §18 (April 30, 2020).

6

Brown makes two arguments, essentially in the alternative. First, he argues that the IWA is *itself* a clear mandate of public policy: the public policy against punishing whistleblowers. (Dkt. 20 at 9). Plaintiff cites no case law in support of this argument and only briefly discusses it, so the Court finds that it has been waived. In any case, if the IWA constituted a clearly mandated public policy for purposes of the tort of retaliatory discharge then the tort remedy and the statutory remedy would be coextensive. The Illinois Supreme Court has implied that where the underlying law contains its own deterrent mechanism, the tort of retaliatory discharge is unlikely to be an appropriate remedy. *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 508, 568 N.E.2d 870, 876 (1991).

In the alternative, Brown argues that the public policy in question was the "statutory scheme" of "programs to help [Illinois] citizens combat the virus" (Dkt. 20 at 10). The Court understands Plaintiff to be referring to Governor Prizker's Executive Orders and their enabling statute, the EMAA.

Biomat first counters that "public policy" can *only* be found in "the state or federal constitutions and statutes, and, when they are silent, in Illinois or federal case law." *Roberts v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 135 N.E.3d 891, (Ill. 2019) (citing *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 880 (Ill. 1981)). Biomat asserts that because Brown reported violations of an executive order promulgated under a state statute rather than violations of the statute itself, no public policy could have been implicated by his firing. (Dkt. 25 at 3–4). But the *Palmateer* quote Biomat excerpts from *Roberts* is incomplete, and Biomat interprets it too literally.

7

In *Palmateer*, the Illinois Supreme Court recognized a "clear mandate of public policy" when an employee was fired "for supplying information to a local law-enforcement agency". *Palmateer,* 421 N.E.2d at 879. The Court emphasized that enforcement of the state's criminal code was a core public policy and reasoned more broadly that "[t]here is no public policy more important or more fundamental than the one favoring the effective protection of the *lives* and property of citizens." *Id.* at 879 (emphasis added). The Illinois Supreme Court allowed both an IWA claim and a retaliatory discharge claim, and observed that "[t]here is no precise definition of the term ['public policy']. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively." *Palmateer*, 421 N.E.2d at 878–79. It went on to say that "a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort [of retaliatory discharge] will be allowed." *Id*. Importantly, the Illinois Supreme Court also said that "*[n]o specific constitutional or statutory provision* requires a citizen to take an active part in the ferreting out and prosecution of crime, but public policy nevertheless favors citizen crime-fighters." *Palmateer*, 421 N.E.2d at 880. Although no specific constitutional or statutory provision requires citizens to uphold the state's COVID-19 safety protocols, it is difficult to imagine rules that strike more directly "at the heart of a citizen's social rights, duties, and responsibilities."

Boimat next tries to distinguish *Palmateer*, but its analogies to other cases about medical treatment are unpersuasive. They describe instances in which medical professionals were fired for reporting deviations from best-practices to medical

8

authorities, not reporting serious violations of an Executive Order to a federal agency in the midst of a national crisis.

In *Turner v. Mem'l Med. Ctr.*, the Illinois Supreme Court held that a respiratory therapist did not state a claim of retaliatory discharge after he was fired for complaining to his hospital's non-profit accreditor. 233 Ill.2d 494, 503 (Ill. 2009). He complained the hospital allowed therapists to complete patients' charts any time during their shift rather than immediately after appointments. Delayed recordkeeping was not in keeping with the accreditor's own best practices, and therefore violated the Illinois patients' statutory right "to care consistent with sound nursing and medical practices." *Id*. at 498. The Supreme Court found that "patient safety" was a "broad, general statement of policy" and therefore "inadequate to justify finding an exception to the general rule of at-will employment," in part because it "fail[ed] to provide essential notice to employers." *Id*. at 502–03. The facts of *Turner* are a far cry from the facts before the Court today. The violations Brown witnessed contravened a very specific Executive Order. The public policy evinced by that Executive Order was clearly articulated. Brown reported the violations he witnessed to the FDA (a government agency tasked with safeguarding public welfare, similar to *Palmateer*).

Likewise, in *Ulm v. Mem'l Med. Ctr.*, an Illinois appellate court held that the plaintiff, a hospital operations manager, had not stated a claim of retaliatory discharge. 964 N.E.2d 632, 638 (Ill. App. 4th 2012). She was fired for refusing to certify that a patient's medical records were complete and for complaining that the

hospital's recordkeeping system did not comply with accreditor standards and therefore with state law. *Id*. The *Ulm* court issued a very narrow ruling against the plaintiff, saying her firing "could not have violated a clearly mandated public policy [. . .] because plaintiff, as operations manager of the health information department and its representative with respect to the hospital's accreditation, *was herself responsible* for bringing defendant into compliance with the regulations she complained defendant violated." *Id*. (emphasis added). Biomat has not argued that Brown was responsible for its violations of the Executive Order.

Public policy is identified by "examining the history, purpose, language and effect of the provision." *Hinthorn v. Roland's of Bloomington, Inc.*, 519 N.E.2d 909, 913 (Ill. 1988). Executive Order 2020-10 demonstrates a commitment to public health and combatting the spread of COVID-19. Assuming Biomat discharged Brown under the circumstances alleged, Brown has plausibly claimed that it violated a clearly mandated public policy.

### IV. Conclusion

For these reasons, Biomat's motion to dismiss (Dkt. 17) Counts I and II is denied. Biomat shall file its Answer by August 17, 2021.

E N T E R:

Dated: July 28, 2021

*[signature: Mary M Rowland]*

_____
MARY M. ROWLAND
United States District Judge